# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHRISTINE HICKS,

    Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

    Defendant.

Civil Action No. 05-2093 (CKK)

## MEMORANDUM OPINION
(June 16, 2010)

Plaintiff Christine Hicks brings this action seeking review of the final administrative decision by Defendant Michael J. Astrue, in his official capacity as Commissioner of Social Security (the "Commissioner"),[1] denying Plaintiff's claim for Supplemental Security Income Benefits ("SSIB") pursuant to 42 U.S.C. § 405(g). Pending before the Court are Plaintiff's Motion for Judgment of Reversal and Defendant's Motion for Judgment of Affirmance. After reviewing the parties' briefs, the administrative record, and the relevant case law, the Court shall DENY Plaintiff's [6] Motion for Judgment of Reversal and shall GRANT Defendant's [10] Motion for Judgment of Affirmance, for the reasons that follow.

## I. BACKGROUND

### A. Legal Framework and Procedural History

Plaintiff filed an application for SSIB pursuant to Title XVI of the Social Security Act on

---

[1] Plaintiff's Complaint named as the Defendant the then-Commissioner of Social Security, Jo Anne B. Barnhart. As Ms. Barnhart was sued in her official capacity, the Court has substituted the current Commissioner of Social Security, Michael J. Astrue, as the Defendant pursuant to Federal Rule of Civil Procedure 25(d).

May 2, 2001.  *See* Administrative Record ("A.R.") at 22, 109-11.[2]  To qualify for SSIB, a

claimant must demonstrate a disability, which is defined by the Social Security Act as an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or has lasted or can be

expected to last for a continuous period of not less than 12 months."  *See* 42 U.S.C. § 416(i)(1);

*id.* § 1382c(a)(3)(A).  In addition, a claimant seeking SSIB must have a severe impairment that

makes him unable to perform past relevant work or any other substantial gainful work that exists

in the national economy.  *See id.* § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).  Substantial gainful

work activity is work activity that involves doing significant physical or mental activities and is

the kind of work that is usually done for pay or profit.  *See* 20 C.F.R. § 404.1472.

In making a disability determination, an Administrative Law Judge ("ALJ") is required to

use a five-step sequential analysis examining (1) the claimant's recent work activity, (2) the

severity and duration of the claimant's impairments, (3) whether the claimant's impairments are

medically equivalent to those contained in the Listing of Impairments promulgated by the Social

Security Administration, (4) the claimant's residual functional capacity and ability to perform

past work, and (5) the claimant's ability to perform jobs reasonably available in the national

economy.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4); *see also Brown v. Barnhart*, 408 F. Supp. 2d 28,

32 (D.D.C. 2006).  At the first step in the analysis, the ALJ must determine whether the claimant

is working and whether the work is substantial gainful activity; if so, the claim must be denied.

_____

[2] Although Plaintiff indicates in the introductory paragraph of her Motion that she applied
for both Supplemental Security Income Benefits as well as Disability Insurance Benefits,
*see* Pl.'s Mot. at 1, her reference to Disability Insurance Benefits appears to be a typographical
error as the only application under review is Plaintiff's claim for SSIB.

*See Brown*, 408 F. Supp. 2d at 32. At step two, the ALJ must determine whether the claimant's impairments are severe; if they are not, the claim must be denied. *Id.* In step three, the ALJ compares the impairments to a listing of impairments that automatically qualify as a disability under the regulations. If the claimant's impairments match those listed, disability is conclusively presumed. *Id.* If there is no match, the ALJ proceeds to step four and determines whether the claimant has any residual functional capacity to perform his old job. If so, the claim will be denied. *Id.* If not, the ALJ proceeds to step five and determines whether there is any other gainful work in the national economy that the claimant could perform notwithstanding his disability. Although the claimant bears the burden of proof with respect to the first four steps of the analysis, at step five the burden shifts to the Social Security Administration to demonstrate that the claimant is able to perform "other work" based on his residual functional capacity, age, education, and past work experience. *Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004). If so, the claim must be denied.

At the time of Plaintiff's hearing, she was a 42 year-old female resident of the District of Columbia. A.R. at 23. Plaintiff has a 12th grade high school education, and her past relevant work includes work as a finance assistant. *Id.* In her application for SSIB, Plaintiff alleged that she was disabled as of July 1, 1997, due to depression, high blood pressure, a seizure disorder and asthma. *Id.* at 22, 117. Plaintiff's claims were denied both initially and upon reconsideration. *Id.* at 22. Plaintiff requested a hearing, but waived her right to an oral hearing in person before the ALJ. *Id.* at 22, 72-73. A hearing was subsequently scheduled for March 13, 2003. *Id.* at 22. Although Plaintiff had waived her right to appear, the ALJ issued a show cause order requiring Plaintiff to explain her failure to appear at the hearing and ultimately dismissed

the claim on April 14, 2003. *Id.* at 61, 81. Plaintiff then requested review by the Appeals Council, which reversed the ALJ's order of dismissal and remanded the case for decision. *Id.* 100-01. A supplemental hearing was held before an ALJ on January 11, 2005. *Id.* 22. Plaintiff again waived her right to appear and testify at that hearing. *Id.* Her attorney was present, however, as was an impartial vocational expert ("VE"). *Id.* In a decision dated February 1, 2005, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act and denied the requested benefits. *See generally id.* at 19-31.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. *Id.* at 23, 30. At step two, the ALJ found that the medical evidence indicated that Plaintiff had a seizure disorder and hypertension and that both impairments qualified as "severe." *Id.* at 27, 30. The ALJ determined at step three that the impairments did not meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, No. 4 (20 C.F.R. § 404.1520(d)). *Id.* at 27, 30. At step four, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could not return to her past relevant work. *Id.* at 28, 31. The ALJ therefore continued on to step five, at which stage he concluded that Plaintiff was capable of performing a "reduced range of light level work." *Id.* at 28, 31. The ALJ noted, however, that Plaintiff's "capacity to perform a full range of light level work is diminished because she requires unskilled work, with a sit/stand option and limited general public contact." *Id.* at 31. Based on testimony from the VE, the ALJ determined that there were a significant number of jobs in the national economy that Plaintiff could perform, including mail clerk (non postal) and general office helper. *Id.* 29, 31. Accordingly, the ALJ determined that Plaintiff "is not under a 'disability' as defined in the Social Security Act" and "is

not eligible for Supplemental Security Income payments." *Id.* at 30, 31.

Plaintiff sought again review by the Appeals Council. *Id.* at 17-18. On October 14, 2005, the Appeals Council issued an order concluding that there was no basis for granting the request for review. *Id.* at 11-14. Having fully exhausted her administrative remedies, Plaintiff timely filed suit in this Court.

B.       *Evidence Contained in the Administrative Record*

The ALJ evaluated Plaintiff's conditions based on evidence including various medical records (both physical and mental health records) and the testimony of the VE during the administrative hearing in this case. The Court recounts below the most relevant portions of the administrative record.

1.       Medical Records

The medical records indicate that Plaintiff was brought into the Emergency Department at Washington Hospital Center on April 16, 2001, after suffering from a seizure. A.R. at 154-55. Plaintiff reported a history of alcohol abuse and indicated that she had attempted to commit suicide the previous weekend due to the sudden death of her boyfriend. *Id.* She was diagnosed as having a seizure disorder, most likely alcohol related, and depression due to the loss of her boyfriend. *Id.* at 156.

Medical records from Fairfax Hospital Admission, dated April 27, 2001, indicate a follow-up visit from Plaintiff, in which she reported a long history of substance abuse problems. *Id.* at 180. The record show that although arrangements had been made after Plaintiff's April 16, 2001 hospital visit for her to enter a substance abuse program on an outpatient basis, Plaintiff failed to keep the appointment and started drinking again. *Id.* The attending physician, Dr. Dale

A. Harris, noted that Plaintiff had been prescribed Paxil upon discharge from the hospital, but that she reported taking the medication only sporadically. *Id.* On mental status examination, Dr. Harris reported that Plaintiff was cooperative and able to sit through the interview, that she was not suicidal or psychotic, but that her mood and affect were depressed. *Id.* at 179. Plaintiff was diagnosed as having "substance abuse mixed." *Id.*

On July 19, 2001, Plaintiff presented at the Greater Southeast Community Hospital Emergency Department. *Id.* at 290. She had experienced a seizure, was vomiting, and complained of abdominal pain. *Id.* at 288, 290. Plaintiff was found to be alert and oriented with no respiratory deficits or musculoskeletal deficits and a normal cardiovascular status. *Id.* at 298. Her blood pressure was 184/110. *Id.* She was diagnosed with alcohol withdrawal, vomiting, and seizure, *id.* at 287, 289, and was reported to have last drank the day before her visit, *id.* at 294.

Medical records from the Washington Hospital Center show that Plaintiff was admitted shortly thereafter on July 21, 2001, again with abdominal pain, nausea, and vomiting. *Id.* at 483. She reported drinking heavily for two days prior to admission with worsening abdominal pain. *Id.* at 486. She further reported a history of alcohol abuse, cocaine use, depression, suicidal ideation, pancreatitis, seizure disorder, and hypertension. *Id.* Upon physical examination, Plaintiff's blood pressure was 140/100. *Id.* During her hospital stay, Plaintiff had a seizure witnessed by the medical staff. *Id.* She was given medications for her seizure disorder and for her abdominal pain. *Id.* Plaintiff was diagnosed with probable alcohol gastritis, seizure disorder, hypertension, and depression. *Id.*

On August 8, 2001, Dr. Neil P. Schiff, a licensed psychologist, performed a psychological consultative evaluation. *Id.* at 365-69. Plaintiff reported that she had suffered from a seizure

about two times per month while on medication and had made about 30 post-seizure trips to the hospital in the past year.  *Id.* at 367.  She further reported having high blood pressure and asthma. *Id*.  Plaintiff indicated that she was on medication for her seizures as well as for her high blood pressure and asthma.  *Id.*  She reported three hospitalizations for depression and suicide attempts, although she denied any present thoughts of suicide.  *Id.*  She advised that she was taking medication for her depression, although she was not in therapy.  *Id.*  Plaintiff further admitted a history of alcohol and substance abuse, although she represented to Dr. Schiff that she had not used either since 1999.  *Id.* at 368.  Dr. Schiff reported that during her interview, Plaintiff was alert and oriented and showed no signs of any psychotic symptoms or thought disorder during the testing.  *Id.*  In addition, Dr. Schiff administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) and the Wechsler Memory Scales-Third Edition (WMS-III); she achieved a verbal IQ of 76, a performing IQ of 69, and a Full Scale score of 70, which indicates a borderline range of intellectual functioning.  *Id.* at 365, 368.  Dr. Schiff diagnosed Plaintiff with schizoaffective disorder, panic disorder (without agoraphobia), seizure disorder, hypertension, and asthma.  *Id.* at 369.

On August 21, 2001, Dr. Jerome Putnam performed an internal medicine consultative evaluation on Plaintiff.  *Id.* at 479-82.  He noted that Plaintiff was last hospitalized for her asthma in either 1997 or 1998, had no recent emergency room visits for asthma, and was using a Ventolin inhaler as needed.  *Id.* at 479.  She reported a history of depression and indicated that she had been hospitalized on multiple occasion for depression; the records also indicate that she was on medication for control of her depression symptoms.  *Id.*  In addition, Dr. Putnam reported that Plaintiff had a 2-3 year history of seizure disorder, with a seizure occurring every 2-3 weeks,

but that she was on medication for control of her seizure disorder. *Id.* Dr. Putnam also noted

Plaintiff's history of hypertension and reported that she takes medication on a regular basis to

control it. *Id.* On physical examination, Plaintiff was alert, oriented, and in no distress. *Id.* at

480. Her blood pressure was 125/75. *Id.* She was initially diagnosed with a history of seizure

disorder, a history of asthma (mild), a history of hypertension, which he noted was under good

control, and a history of depression, for which Plaintiff was on multiple medications. *Id.* at 480-

81. Dr. Putnam concluded that Plaintiff's "hypertension and asthma are under good control" and

"would not preclude work-related activities other than exposure to noxious fumes or chemicals."

*Id.* at 481. He also opined that "[t]he frequency of the seizure disorder, if this can be adequately

documented, certainly would make long-term employment somewhat problematic until this is

better under control." *Id.* In addition, Dr. Putnam suggested that Plaintiff's "depression needs to

be evaluated by a specialist." *Id.*

On September 10, 2001, Plaintiff was admitted to the Washington Hospital Center with

reports of nausea, vomiting and seizure disorder. *Id.* at 483-84. On physical examination, her

blood pressure was 110/62. *Id.* at 485. She was assessed with gastritis, seizure disorder, asthma

(which was reported to be stable), and a history of urinary tract infections. *Id.* at 484. She was

placed on medication for her seizure disorder. *Id.*

On October 18 & 19, 2001, Plaintiff was examined by DDS physicians. First, a physical

residual function capacity assessment was conducted. *See id.* at 498-506. A primary diagnosis

was made of alcoholic seizures and asthma. *Id.* at 498. Plaintiff was determined to be able to lift

or carry 100 pounds or more occasionally and 50 pounds or more frequently. *Id.* at 499. She was

found to be able to stand or walk and sit for about 6 hours in an 8-hour workday and to be able to

push or pull an unlimited amount. *Id.* She was reported to have no postural, manipulative, visual, communicative or environmental limitations. *Id.* at 500-03. Second, a psychiatric review technique was conducted, indicating that a RFC assessment was necessary. *Id.* at 507. Plaintiff was reported to have a schizoaffective disorder and anxiety (both of which were found to be associated with a substance addiction) and subaverage general intellectual functioning. *Id.* at 508-11. She was further noted to have only mild restrictions of daily living activities and mild difficulties in maintaining social functioning with moderate difficulties in maintaining concentration, persistence, and pace. *Id.* at 512. She did not have any repeated episodes of decompensation. *Id.* Third, a mental residual functional capacity assessment was conducted. *Id.* at 514-16. Plaintiff was found to have no significant limitations in most areas of her understanding and memory, sustained concentration and persistence, social interaction and adaption, with the exception that she was found to have moderate limitations in her ability to carry out detailed instructions, to maintain attention/concentration for extended periods, and to complete a normal workday and workweek without interruption. *Id.* at 514-15. The mental RFC concluded that Plaintiff "appears to retain the capacity for routine work." *Id.* at 516.

On June 19, 2002, Dr. Neal M. Kurzrok, a neurologist, reported that Plaintiff had returned to his office after an admission to the Washington Hospital Center for seizures in April of that year. *Id.* at 538. He noted that he suspected Plaintiff suffered from "a mixed seizure disorder due to both secondarily generalized (organic) seizures from multiple prior head traumas and alcohol," and noted that he "had a high index of suspicion of nonepileptic seizures." *Id.* Dr. Kurzok further suspected that Plaintiff's recent seizures were predominantly "psuedoseizures." *Id.* He diagnosed Plaintiff with peripheral neuropathy due to alcohol and recommended that she

switch seizure medications to prevent any potential affects on her neuropathy. *Id.* The medical records also indicate that Plaintiff had a history of chronic alcohol abuse and depression/anxiety disorder. *Id.*

A second physical residual functional capacity assessment was conducted on April 5, 2002, which largely reflects the same findings reached in her October 2001 assessment outlined above. *See* A.R. at 523-30. The conclusions differed only insofar as the second assessment indicates that Plaintiff could lift or carry 50 pounds (as opposed to 100 pounds or more) frequently and 25 pounds (as opposed to 50 pounds or more) frequently and that she had several environmental limitations. *Id.* at 524, 527. Otherwise, she was again found to be able to stand or walk and sit for about 6 hours in an 8-hour workday, and to be able to push or pull an unlimited amount. *Id.* She was also reported to have no postural, manipulative, visual or communicative limitations. *See id.*

The record contains a second medical report by Dr. Publicker dated June 20, 2002. *Id.* at 532-33. Dr. Publicker stated that Plaintiff had been diagnosed with alcohol and cocaine dependence and with a major depressive disorder (recurrent and moderate). *Id.* at 532. He reported that Plaintiff was on medications for her seizures and depression. *Id.* Plaintiff was also noted to have pscyhomotor retardation; her mood was reported to be depressed, anhedonic, and defeated; and her affect sad. *Id.* She did not suffer from any hallucinations or delusions, and she had no thought process disturbance. *Id.* at 532-33. Her memory was reported to be intact with fair impulse control and moderate judgment. *Id.* at 533. Dr. Publicker concluded that Plaintiff was "fully disabled by both psychiatric and medical (recurrent pancreatitis, hemorrhagic gastritis, convulsions)." *Id.* Dr. Publicker issued a similar report on January 11, 2002 and again on

September 5, 2002, reaching the same conclusions as set forth in his June 20, 2002 report. *Id.* at 565-66.

Finally, medical records dated August 25, 2004 from a Dr. Shabana Firbous indicate that Plaintiff had been diagnosed with major depressive disorder with psychotic features and she was on medication for her depression. *Id.* at 567. The records further show that Plaintiff lived independently, had appropriate behavior, was coherent, and had a logical, goal-directed stream of thought. *Id.* at 567-68. In addition, the records indicate that Plaintiff was depressed, self-reported auditory hallucinations, and suffered from a paranoid ideation that "others are out to get her." *Id.* at 566. She was reported to be oriented, with intact memory and fair impulse control, although her insight and social judgment were noted to be poor. *Id.* at 568. Dr. Firbous concluded that Plaintiff's prognosis was "guarded" given her failure to be compliant with her medication and her history of alcohol abuse, and indicated that she would likely decompensate further due to the stress of work. *Id.*

### 2. Transcript of the Administrative Hearing

Plaintiff's supplemental hearing was held before an ALJ on January 11, 2005. *Id.* at 22. As indicated above, Plaintiff waived her right to appear and testify at that hearing. *Id.* However, her attorney was present as was an impartial VE. *Id.* Given Plaintiff's absence from the hearing, the testimony consisted solely of testimony from the VE, who stated that he was familiar with Plaintiff's medical records. *Id.* at 691. The ALJ asked the VE to consider two hypotheticals. First, the ALJ asked the VE to consider "a hypothetical person who has the same age, education, work experience as the claimant, and who has the capacity to do light work, unskilled, with a sit/stand option and limited general public contact." *Id.* The ALJ then asked if the VE could

"identify any jobs that such a hypothetical person can perform on a sustained basis in which jobs exist in significant numbers in the national economy." *Id.* The VE responded in the affirmative, testifying that "[l]ight duty, unskilled work for such a hypothetical person would include assembly work, particularly small products assembly done at a bench type setting" as well as "a non postal mail clerk" and "a general office helper." *Id.* at 691-92. Second, the ALJ asked the VE to consider "a hypothetical person who has the same age, education, and work experience as the claimant, and who has the capacity to do sedentary work, unskilled with a sit/stand option and limited general public contact." *Id.* at 692. The VE indicated that sedentary, unskilled work available for such a person would include "administrative support work such as an addresser" or "[f]inal assembly work." *Id.* The VE indicated that the examples provided of the type of work were representative only and were not exhaustive. *Id.* He also stated that these jobs were all consistent with the *Dictionary of Occupational Titles*, with the exception of the sit/stand option, which is not addressed in that publication but was based on the VE's own knowledge and understanding. *Id.* at 692-93.

At the conclusion of the ALJ's questions, Plaintiff's attorney asked the VE three additional hypotheticals. First, Plaintiff's attorney asked the VE to consider, in addition to the above hypotheticals, the further limitation that the individual's "ability to concentrate on a job task was poor." *Id.* at 693. The VE responded that this additional limitation would preclude all work. *Id.* Second, Plaintiff's attorney asked the VE to again consider the hypotheticals presented by the ALJ, but this time with the further limitation that the individual had "poor social judgment," meaning that "their ability to get along with people, interact with coworkers and supervisors would [be] seriously impair[ed]." *Id.* The VE responded that this additional

limitation would also preclude all work. *Id.* Third and finally, Plaintiff's attorney asked the VE to consider the further limitation that the individual "is also likely to decompensate due to stress of work." *Id.* at 694. The VE indicated that this would also preclude work. *Id.*

## II. LEGAL STANDARD

"In a disability proceeding, the ALJ 'has the power and the duty to investigate fully all matters in issue, and to develop the comprehensive record required for a fair determination of disability.'" *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (quoting *Diabo v. Sec'y of HEW*, 627 F.2d 278, 281 (D.C. Cir. 1980)). The Social Security Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Inability to engage in substantial gainful activity not only includes the individual's inability to do his previous work, but requires as well an inability, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* at § 423(d)(2)(A). In making this determination, the ALJ is to consider (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) the plaintiff's age, education, and work history; however, "[t]he expert opinions of a treating physician are binding on the fact finder unless contradicted by substantial evidence to the contrary." *Davis v. Heckler*, 566 F. Supp. 1193, 1196 (D.D.C. 1983) (citing cases).

A court will not disturb the determination of the Commissioner if it is based on

substantial evidence in the record and the correct application of the relevant legal standards. 42 U.S.C. §§ 405(g), 1383(c); *Butler*, 353 F.3d at 999. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). "The test 'requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence.'" *Butler*, 353 F.3d at 999 (quoting *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365-66 (D.C. Cir. 2003)).

In reviewing an administrative decision, a court may not determine the weight of the evidence nor substitute its judgment for that of the Commissioner if his decision is based on substantial evidence. *Butler*, 353 F.3d at 999; *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Instead, the reviewing court must carefully scrutinize the entire record to determine whether the Commissioner, acting through the ALJ, has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative material. "Because the broad purposes of the Social Security Act require a liberal construction in favor of disability, the court must view the evidence in the light most favorable to the claimant." *Martin v. Apfel*, 118 F. Supp. 2d 9, 13 (D.D.C. 2000) (citing *Davis v. Shalala*, 862 F. Supp. 1, 4 (D.D.C. 1994)).

The reviewing court must also determine whether credible evidence was properly considered. *Id.* (citing *Dionne v. Heckler*, 585 F. Supp. 1055 (D. Me. 1984)). Importantly, an ALJ cannot merely disregard evidence which does not support his conclusion. *Dionne*, 585 F. Supp. at 1060. A reviewing court should not be left guessing as to how the ALJ evaluated probative material, and it is reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence. *Martin*, 118 F. Supp. 2d at 13 (citing *Davis*, 862 F. Supp. at 2).

## III. DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed, or alternatively that this case should be remanded to the Social Security Administration for a new hearing. She makes two arguments in support of these requests: (1) the ALJ erroneously determined that Plaintiff's depression and borderline intellect were not severe impairments at step two of the sequential analysis; and (2) the ALJ erroneously assessed Plaintiff's RFC at step five of the sequential analysis. The Court shall address these arguments below, ultimately concluding that there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act.

### A.     *The Severity Analysis at Step Two*

Plaintiff first argues that the ALJ committed legal error when he found that Plaintiff's hypertension and seizure disorder, but not her depression and borderline intellect, were severe impairments. Pl.'s Mot. at 4-9. As indicated above, at step two of the sequential process, the ALJ must "consider the medical severity of [the claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant has a severe impairment, the ALJ must proceed to step three; if, however, the claimant does not have a severe impairment, the claimant is found to be not disabled. *See id.* Citing to *McDonald v. Secretary of Health and Human Services*, 795 F.2d 1118 (1st Cir. 1986) and *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985), Plaintiff contends that an impairment must be found to be severe at step two so long as it has more than a *de minimis* affect on the individual's ability to work. Pl.'s Mot. at 5. In this case, Plaintiff asserts that — despite the ALJ's finding of non-severity — there is substantial evidence in the record indicating that her depression and borderline intellect, like her

hypertension and seizure disorder, have more than a *de minimis* effect on her ability to perform her past relevant work or substantial gainful activity. *Id.* at 5-9. Accordingly, Plaintiff urges that the ALJ committed a legal error when he failed to find Plaintiff's depression and borderline intellectual functioning were also severe at step two.

In response, the Commissioner argues that, even assuming the ALJ improperly found Plaintiff's depression and borderline intellect to be non-severe, such an error does not require reversal in this case because the ALJ did not deny Plaintiff's benefits at step two and instead proceeded to consider all of Plaintiff's impairments — including her depression and borderline intellectual functioning — in determining Plaintiff's RFC and ability to perform past relevant work and/or substantial gainful activity. Def.'s Mot. at 8-9. Specifically, the Commissioner emphasizes that the ALJ determined that Plaintiff had a severe impairment or combination of impairments at step two (here, hypertension and seizure disorder). The ALJ therefore continued on to consider the remaining steps in the sequential analysis and, in so doing, discussed and evaluated in detail all of the evidence relating to Plaintiff's impairments, including those impairments that were not specifically identified as being independently severe at step two of the evaluation process. Accordingly, the Commissioner urges that Plaintiff was not prejudiced by the ALJ's determination that her remaining impairments were non-severe because he did not deny benefits at step two based on a finding of non-severity and the medical evidence relating to Plaintiff's borderline intellectual functioning and depression were carefully considered by the ALJ. *See id.*

The Court agrees with the Commissioner that any alleged error at step two does not require reversal in this case. While it appears that no court in this Circuit has yet addressed the

question at hand, the Sixth, Ninth, and Tenth Circuits have each held that alleged errors at step

two do not necessarily require reversal so long as the ALJ considered the omitted impairment(s)

in evaluating the remaining steps in the sequential analysis. For example, in *Burch v. Barnhart*,

400 F.3d 676 (9th Cir. 2005), the Ninth Circuit rejected the plaintiff's argument that the failure to

consider her obesity at step two required reversal of the Commissioner's decision denying her

benefits. *Id.* at 681-82. The Ninth Circuit observed that, "[a]ssuming without deciding that this

omission constituted legal error, it could only have prejudiced [plaintiff] in step three (listing

impairment determination) or step five (RFC) because the other steps, including this one, were

resolved in her favor." *Id.* Because the plaintiff did not identify any legal errors at either of

those steps, the Ninth Circuit concluded that "[u]nder the circumstances . . ., the ALJ did not

commit reversible error by not considering [plaintiff's] obesity in step two of the sequential

analysis." *Id.* at 682. In other words, so long as there is no indication that the impairments

allegedly omitted at step two would have met a listing at step three and the ALJ properly

considered the omitted impairments in evaluating the plaintiff's RFC at step five, then the Ninth

Circuit held that the legal error at step two is harmless. *See id.*

The Sixth Circuit reached the same conclusion in *Maziarz v. Secretary of Health and

Human Services*, 837 F.2d 240 (6th Cir. 1987), determining that it was "unnecessary to decide"

whether the ALJ had committed a legal error when he failed to find the plaintiff's cervical

condition constituted a severe impairment at step two. *Id.* at 244. In reaching this conclusion,

the Sixth Circuit emphasized that the ALJ had found that the plaintiff's other conditions were

severe and had therefore continued with the remaining steps in the sequential analysis. *Id.* at

244. The *Maziarz* Court concluded, "[s]ince the Commissioner properly could consider

17

claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Commissioner's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error." *Id.* Similarly, in *Carpenter v. Astrue*, 537 F.3d 1264 (10th Cir. 2008), the Tenth Circuit rejected the plaintiff's argument that the decision below should be reversed because the ALJ applied the wrong legal standard at step two when he failed to consider whether her impairments were severe both individually and in combination. *Id.* at 1265-66. The Tenth Circuit concluded that "any error [at step two] became harmless when the ALJ reached the proper conclusion that [plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step in the evaluation sequence." *Id.* at 1265-66.

The Court is persuaded by the reasoning of these decisions and agrees that, in this case, any legal error made at step two does not require reversal. Even assuming that the ALJ legally erred when he determined that Plaintiff's borderline intellectual functioning and depression were non-severe, such an omission did not prejudice Plaintiff because the ALJ specifically found that Plaintiff's seizure disorder and hypertension were severe, AR at 27, 30, and therefore continued to consider the remaining steps in the sequential analysis, *see id.* at 27-31.

Although Plaintiff may have been able to demonstrate prejudice if she could show that either of these omitted impairments would have been found to meet a listing at step three, there is no indication in the record that either Plaintiff's depression or borderline intellectual functioning satisfied any enumerated listing. Plaintiff appears to recognize as much as she makes no argument in her current briefing that either her depression or borderline intellectual functioning meet or equal one of the listings. *See generally* Pl.'s Mot. Indeed, despite making no explicit

finding that Plaintiff's borderline intellectual functioning and depression were severe, it is clear that the ALJ nonetheless considered whether these impairments met a listing and found that neither satisfied this third step. Specifically, with respect to Plaintiff's borderline intellectual functioning, the ALJ concluded that this impairment did not satisfy the Section 12.05 (mental retardation) listing "because the claimant does not have significantly sub-average intellectual function with deficits in the adaptive functioning initially manifested during her developmental period." A.R. at 27. With respect to Plaintiff's depression, although the ALJ did not expressly identify the Section 12.04 (affective disorders) listing, it is nonetheless clear that he evaluated Plaintiff's impairment under the criteria set forth in Section 12.04 and found that Plaintiff's depression did not meet or equal the listing. Section 12.04 requires consideration of, *inter alia,* whether the individual's depressions results in "marked restriction of activities of daily living," "marked difficulties in maintaining social functioning," "marked difficulties in maintaining concentration, persistence, or pace," or "repeated episodes of decompensation, each of extended duration." In this case, the ALJ determined that "the evidence of record shows that the claimant's depression causes functional limitations that result in only mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration." A.R. at 30.

Accordingly, even absent a finding of severity at step two, the ALJ considered whether Plaintiff's borderline intellect and depression met or equaled a listing, as required in step three. Plaintiff makes no argument that the ALJ's conclusions on this point are in error nor does she at any point argue that her borderline intellectual functioning and depression did in fact meet or

equal the impairments listed in Appendix 1, Subpart P, No. 4. *See generally* Pl.'s Mot. As such, even assuming that the ALJ committed a legal error at step two, Plaintiff was not prejudiced by this error at step three of the sequential analysis.

Nor did any such legal error prejudice Plaintiff at step five of the evaluation. As is evident from review of the ALJ's decision, he considered Plaintiff's borderline intellectual functioning and depression in setting forth her RFC at step five. *See* A.R. at 27-30. Plaintiff appears to acknowledge as much; while she argues that the ALJ failed to consider her depression and borderline intellect at step two, she makes no similar argument in challenging the ALJ's analysis at step five. *See generally* Pl.'s Mot. at 9-16. Regardless, for the reasons set forth below, the Court finds that the ALJ properly assessed Plaintiff's RFC and considered all of her impairments — including her depression and borderline intellectual functioning — at step five of the analysis. Accordingly, the Court need not determine whether the ALJ's finding of non-severity as to Plaintiff's depression and borderline intellect was legal error, as any alleged error at step two did not prejudice Plaintiff and therefore does not require reversal.

>    B.    *The Residual Functional Capacity Analysis at Step Five*

To make a determination under steps four and five of the disability analysis, which involve an inquiry into the claimant's ability to return to past work and a determination of whether future employment of any variety is possible, *see* 20 C.F.R. §§ 404.1520, 416.920, the ALJ must engage in a residual functional capacity ("RFC") analysis. 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184 at *2 (S.S.A. July 2, 1996). An RFC is "an administrative assessment of the extent to which an individual's medically determinable

impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical or mental activities." SSR 96-8p, 1996 WL 374184 at *2. The ALJ must explain how he considered and resolved ambiguities in the record with regard to the ultimate RFC decision. *Butler*, 353 F.3d at 1000.

Plaintiff raises three main arguments challenging the ALJ's RFC analysis. First, she argues that the ALJ was required to, but did not, perform a function-by-function assessment of Plaintiff's ability to work, and include a narrative discussion of how the evidence supported the ALJ's RFC conclusion. Pl.'s Mot. at 9-13. Second, she argues that the ALJ failed to include any limitations in the RFC that addressed Plaintiff's hypertension and seizure disorder, which impairments the ALJ had previously determined to be severe. *Id.* at 9. Finally, she argues that the ALJ failed to engage in a detailed assessment of Plaintiff's capacity to perform the mental demands of work. *Id.* at 13-16. The Court finds that these arguments are without merit.

First, the ALJ performed a sufficient function-by-function assessment and provided a sufficient narrative in support thereof. Plaintiff is correct that SSR 96-8p requires the ALJ to assess a claimant's "work-related abilities on a function-by-function basis" and instructs that "[o]nly after that may RFC be expressed in terms of exertional levels of work . . . ." SSR 96-8p, 1996 WL 374184 at *1.[3] However, SSR 96-8p also provides that "[w]hen there is no allegation

---

[3] SSR 96-8p specifically instructs the ALJ to consider the functions in paragraphs (b), (c), and (d) of 20 C.F.R. § 416.945, which include physical abilities (sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions including manipulative or postural functions), mental abilities (understanding, remembering, carrying out instructions, responding appropriately to supervision, coworkers, and work pressures in a work setting), and other abilities affected by impairments (including specifically, impairments of vision). 20 C.F.R. § 416.945.

of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id.*

In this case, the ALJ performed a sufficient function-by-function assessment of all functions for which the record included evidence of limitations. "[A]fter careful evaluation of the evidence," the ALJ concluded that Plaintiff "retains the residual functional capacity to perform a reduced range of light level work. The claimant's capacity to perform a full range of light level work is diminished, because she requires unskilled work, with a sit/stand option and limited general public contact." A.R. at 27. The ALJ's conclusion is supported by substantial evidence in the record. As indicated previously, Plaintiff's most recent physical residual functional capacity assessment, conducted on April 5, 2002, indicated that Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently; was able to sit, stand, or walk for about 6 hours in an 8-hour workday; was able to able to push or pull an unlimited amount; and had several environmental limitations, but no postural, manipulative, visual or communicative limitations. A.R. at 523-30. "Light work," which the ALJ found Plaintiff capable of performing, by definition involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). The record evidence therefore supports the ALJ's RFC conclusion that Plaintiff could perform "light work." Indeed, as the Commissioner points out, it appears that the ALJ could have found Plaintiff capable of performing "medium work," which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id.* § 416.967(c).

While the ALJ did not specifically discuss the Plaintiff's physical abilities (sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions including manipulative or postural functions), in reaching this conclusion, the Court finds that this omission was not error. In this case, there is no evidence in the record indicating that Plaintiff had any limitation or restriction on her physical capabilities — a point Plaintiff does not dispute. Given the absence of any indication that Plaintiff's ability to perform these tasks was somehow limited, the ALJ was not required to specifically address each of these abilities in his opinion. *See* SSR 96-8p, 1996 WL 374184 at *1 ("[w]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity"); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); *cf. Hartline v. Astrue*, 605 F. Supp. 2d 194, 207 (D.D.C. 2009) (rejecting argument that ALJ committed reversible error because he did not specifically list the work-related functions itemized on the RFC). Thus, to the extent Plaintiff argues that the ALJ failed to provide specific support for his findings with respect to her RFC and did not include a sufficient narrative discussion of the evidence supporting his conclusions, such assertions are without merit. Given the dearth of any evidence in the record indicating that Plaintiff had any physical limitations, the ALJ's discussion was sufficient.

Second, there is substantial evidence in the record supporting the ALJ's finding that Plaintiff's seizure disorder and hypertension did not require additional physical limitations in her

RFC. As the ALJ observed and as Plaintiff does not dispute, the medical evidence in the record "shows that [Plaintiff's] seizures are well controlled when [she] is compliant with prescribed treatment and does not abuse alcohol or cocaine." A.R. at 27. Given this fact, the ALJ reasonably omitted any limitation in the RFC relating solely to Plaintiff's seizure disorder. *Cf. Jones v. Astrue*, 654 F. Supp. 2d 37, 42 (D.D.C. 2009) ("'If a symptom can be reasonably controlled by medication or treatment, it is not disabling.'") (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir.1986)); *Banks v. Astrue*, 537 F. Supp. 2d 75, 79 (D.D.C. 2008) (same) (citing cases). Similarly, as the ALJ noted in his opinion, the evidence in the record indicated that Plaintiff took medication for her hypertension and that it was "under good control." A.R. at 480-81. Accordingly, because Plaintiff's hypertension was controlled by medication, the ALJ omission of any specific limitations in the RFC relating to the impairment was also not error.

Third, the ALJ sufficiently considered Plaintiff's capacity to perform the mental demands of work in assessing her RFC. The ALJ explicitly rejected Plaintiff's assertion that her RFC should include "the additional limitations of poor ability to concentrate on job tasks, poor social judgment and work stress that results in less than 80 percent performance level required by employers," finding that "claimant does not possess these limitations." A.R. at 29. Rather, the ALJ concluded that Plaintiff's "medical determinable impairments are reasonably anticipated to cause some decrease in concentration, judgment and some loss of productivity if she has to perform more than simple routine unskilled work." *Id.* Because Plaintiff's RFC was already limited to unskilled work with limited general public contact, no further limitations were necessary.

In reaching this conclusion, the Court finds that the ALJ considered the relevant medical

evidence, identified any inconsistencies in the record, and adequately explained how he arrived at

his conclusions. Specifically, the ALJ explained his conclusion as follows:

> The claimant has been diagnosed as having a depressive disorder. Little weight was given to Dr. Publicker's opinion that the claimant is disabled due to psychiatric and medical reasons because it is not supported by objective medical evidence and it is inconsistent with the other evidence of record. In April 2001, the claimant experienced symptoms of depression due to the loss of her boyfriend. Later, in that same month, her attending physician noted that she was prescribed Paxil, but she took it sporadically which indicates noncompliance with prescribed treatment. On mental status examination, she was not suicidal nor psychotic, although she had depressed mood and affect. In August 2001, Dr. Schiff also observed that the claimant was alert and oriented and showed no signs of any psychotic symptoms or thought disorder during testing despite her reports of hallucinations in the past. In June 2002, when Dr. Publicker examined the claimant, she ha[d] no hallucinations or delusion and she had no thought process disturbance. Although she had some decrease in her ability to concentrat[e] this was not substantiated by objective testing and he noted that claimant's memory was intact. Dr. Publicker's own findings indicate that the claimant's mental impairments do not prevent her from performing simple unskilled work with limited general public contact. Moreover, the claimant's most recent evaluation by Dr. Firbous, in August 2004, shows that she continues to be capable of performing simple unskilled work. For instance, her behavior was appropriate. Her characteristic of speech was coherent. She reported hallucinations. Her thoughts were logical and goal directed. Her memory was intact. Although Dr. Firbous noted that the claimant had poor concentration, her insight was poor, and she is likely to decompensate further due to stress of work, his opinion was based upon the claimant's guarded prognosis due to non-compliance and alcohol abuse.

*Id.* at 29-30. Based on this analysis, the ALJ further concluded that:

> [T]he evidence of record shows that claimant's depressions causes functional limitations that result in only mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. Because depression does not impose significant restrictions in her ability to perform basic work activities, the undersigned finds that depression is non-severe. Great weight was given to the opinion of the psychological consultant [Dr. Cott] that the claimant has the capacity for routine work. This opinion is consistent with Doctors Publicker's and Firbous' findings on mental status examination.

*Id.* at 30.

While Plaintiff contends that the ALJ failed to provide a detailed assessment of her mental RFC, even a cursory glance at the passage above demonstrates that the ALJ carefully and thoroughly considered the evidence in the record and provided a particularized assessment of her alleged impairment due to depression. Similarly, the Court finds that the ALJ identified inconsistencies in the record and explained how he arrived at his conclusion. The ALJ acknowledged Dr. Publicker's opinion that Plaintiff was disabled as the result of her psychiatric and medical impairments, but determined that this conclusion was not well-supported by the evidence in the record. *See id.* Despite Plaintiff's assertions that the ALJ failed to provide a proper explanation for doing so, a review of the ALJ's opinion reveals otherwise. Finally, as Plaintiff fails to identify any specific errors in the ALJ's assessment of her mental RFC, other than the general claims addressed above, *see* Pl.'s Mot. at 13-16, the Court finds that the ALJ sufficiently considered Plaintiff's mental impairments in assessing her RFC.

## IV. CONCLUSION

Based on the foregoing review of the relevant law and the administrative record, the Court finds that the Administrative Law Judge applied the correct legal standards and relief on substantial evidence when he denied Plaintiff's claim for Supplemental Security Income Benefits. The Court shall therefore DENY Plaintiff's [6] Motion for Judgment of Reversal and shall GRANT Defendant's [10] Motion for Judgment of Affirmance. This case shall be dismissed in its entirety. An appropriate Order accompanies this Memorandum Opinion.

Date: June 16, 2010

           */s/*
          **COLLEEN KOLLAR-KOTELLY**
          United States District Judge